# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| WUNDERLICH-MALEC SYSTEMS, INC., ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | Case No. 05 C 04343 |
| ) | |
| v. ) | Judge Robert W. Gettleman |
| ) | |
| EISENMANN CORPORATION, ) | Magistrate Judge |
| ) | Martin C. Ashman |
| Defendant/Counter-Plaintiff. ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion of Plaintiff, Wunderlich-Malec Systems,

Inc. ("W-M"), to compel Defendant, Eisenmann Corporation ("Eisenmann"), to produce certain

documents, and for a declaration that Eisenmann waived any privilege or confidentiality with

respect to these documents. This matter was referred to this Court by Judge Gettleman in

accordance with 28 U.S.C. § 636(b)(1)(A) and Local Rule 72.1. For the reasons set forth below,

W-M's motion is granted.


## I.  Background

The parties' briefs do not give the factual history of this case, as matters surrounding

discovery are the only relevant facts. On April 5, 2006, W-M served Eisenmann with a request

for production of documents. (Pl.'s Mot. ¶1.) Eisenmann responded to this request on May 24,

2006, and on May 30-31, 2006, Eisenmann produced documents at its headquarters in Crystal

Lake, IL. (Pl.'s Mot. ¶¶2, 5.) While inspecting the documents Eisenmann made available, W-M

flagged documents to be copied. W-M received these copies of flagged documents. (Pl.'s Supplemental Mem. at 1.) Throughout this time, Eisenmann did not produce a privilege log outlining what documents might be covered by the attorney-client privilege or the work product doctrine. (Pl.'s Supplemental Mot. ¶5.)

On July 10, 2006, Eisenmann contacted W-M and requested the return of three of the copied documents, Bates stamped 0008675-0008682, 0008703-0008709, and 0008794-0008795. (Pl.'s Mot. ¶6.) According to Eisenmann, these documents were produced inadvertently because Eisenmann accidentally made them available to W-M when W-M inspected Eisenmann's documents in Crystal Lake. (Def.'s Resp. at 9-11.) Eisenmann states that its counsel had reviewed all of Eisenmann's relevant documents prior to May 30, 2006, during which time Eisenmann was keeping all the documents it made available to W-M in 30 binders in a conference room. (Def.'s Resp. at 9.) Eisenmann's counsel removed four of the binders (numbered 19 to 22), which he determined "consisted of attorney-client communications, work product, and trade secrets irrelevant to this action," and he instructed Eisenmann not to disclose these four binders to W-M. (Def.'s Resp. at 9-10.) Despite these instructions, Eisenmann allowed W-M to inspect documents contained in the four binders. (Def.'s Resp. at 11.) According to Eisenmann, this failure to follow its counsel's instructions occurred because of confusion surrounding W-M's inspection of the documents and a general lack of open conference rooms in which Eisenmann could store the documents. (Def.'s Resp. at 9-12.)

Eisenmann states that it did not discover until July 10, 2006 that it had allowed W-M to inspect documents from the four binders. (Def's Resp. at 15.) As mentioned above, Eisenmann's counsel immediately contacted W-M and requested the return of three documents. (*Id.*; Pl.'s

Mot. ¶6.) These documents totaled approximately 17 pages, and W-M returned some of these documents to Eisenmann. (Pl.'s Supplemental Mot. ¶¶ 5, 6.) Eisenmann subsequently contacted W-M on July 21, 2006 and requested the return of additional documents, totaling approximately 146 pages, which Eisenmann alleged were also inadvertently produced in binders 19 to 22. (*See* Pl.'s Supplemental Mot. ¶8.) Eisenmann revised this list of additional documents on July 24, 2006, bringing the number of pages down to 129 pages. (Pl.'s Supplemental Mot. ¶9.)

W-M in this motion asks the Court to find that Eisenmann has waived its privilege as to the documents held in binders 19 to 22. (Pl.'s Mot. at 3.) Eisenmann responds by arguing that the documents at issue are covered by attorney-client privilege, consist of work product, or contain trade secrets. Eisenmann further argues that its production of these documents was inadvertent and that any privilege therefore still applies.[1] (Def.'s Resp. at 1-2.)

---

[1] Eisenmann also argues that W-M's counsel should be sanctioned. Eisenmann first argues that W-M has no good faith basis for its argument and is using this motion for an improper purpose and in order to "unreasonably multip[ly] the proceedings." (Def.'s Resp. at 23.) This argument is without merit because, as this opinion makes evident, W-M's position in this motion has merit and does not unreasonably multiply these proceedings.

Second, Eisenmann argues that W-M's counsel should be disqualified for wrongfully retaining the inadvertently produced documents. (Def.'s Resp. at 23-24.) Essentially, Eisenmann suggests that W-M is ethically obligated to refrain from viewing the documents, to return the documents to Eisenmann, and to make a motion to compel production of these documents from this Court. (Def.'s Resp. at 24.) The Court rejects Eisenmann's argument. The Court notes that this argument does not align with Eisenmann's explanation–discussed below–as to why it did not need to produce a privilege log, namely that W-M was able to discern whether any privilege applies by viewing the documents themselves.

## II.   Discussion

### A.   *Harmony Gold*

Courts in the Northern District of Illinois have followed *Harmony Gold v. FASA Corp.* in

employing a three-step approach when ruling on motions involving the inadvertent production of

allegedly privileged documents. *See Sanner v. Bd. of Trade*, 181 F.R.D. 374, 376 (N.D. Ill.

1998); *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 115 (N.D. Ill. 1996).  These

courts have said,

> As a threshold matter, the court must determine whether the disputed document is
> indeed [privileged]. . . .  If the document is privileged, the court must then
> determine if the disclosure was inadvertent. Lastly, even if the document is found
> to be [privileged] and inadvertently produced, the court must, nonetheless,
> determine whether privilege was waived.

*Sanner*, 181 F.R.D. at 376 (quoting *Harmony Gold*, 169 F.R.D. at 115).


### 1.   Whether the Documents Are Privileged

Eisenmann argues that various disclosed documents are covered by attorney-client

privilege, constitute work product doctrine, or contain trade secret information.  First, Eisenmann

claims that the documents with the following Bates stamps are covered by the attorney-client

privilege: 0008420-0008422; 0008665; 0008719-0008721; 0008738-0008740;

0008868-0008870; 0008675-0008677; 0008703-0008705; 0008706-0008709;

0007987-0007993; 0008806-0008817.  Under Seventh Circuit case law,

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser
> in his capacity as such, (3) the communications relating to that purpose, (4) made
> in confidence (5) by the client, (6) are at his instance permanently protected
> (7) from disclosure by himself or by the legal adviser, (8) except that protection
> may be waived.

- 4 -

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (citation omitted). Eisenmann states that these documents are all communications between Eisenmann and Campion, Curran, Dunlop & Lamb, P.C., Eisenmann's attorneys. (Def.'s Resp. at 3.) Referring to its privilege log (which it filed as an attachment to its Response), Eisenmann further states that the documents consist of correspondence and "additional documents" that indicate Eisenmann's "strategy and goals in this litigation." (*Id.*) Eisenmann also includes an affidavit of one of its general managers who states that the communications were made in confidence. (Def.'s Resp. Ex. 2.)

Second, Eisenmann argues that some of the documents produced constitute work product. A party seeking to employ the work product doctrine must show that the material sought was produced in anticipation of litigation. *See Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983); *Sanner*, 181 F.R.D. at 378. Materials produced "in anticipation of litigation" must be distinguished from materials "developed in the ordinary course of business," as the latter are entitled to no protection. *Sanner*, 181 F.R.D. at 378 (citing *Binks Mfg Co.*, 709 F.2d at 1120). Eisenmann has claimed that the work product doctrine covers documents with the following Bates numbers: 0008420-0008422; 0008665; 0008719-0008721; 0008868-0008870; 0008675-0008677; 0008703-0008705; 0008706-0008709; 0007987-0007993; 0008806-0008817; 0008794-0008795. Eisenmann argues that these documents were prepared in anticipation of litigation because they "discuss strategy, opinions, and the claims, which had already been filed with this Court in this litigation." (Def.'s Mem. at 4.)

The Court assumes for the purposes of this motion that the documents Eisenmann identified can be covered by the attorney-client privilege, the work product doctrine, or both. The dispute in the present motion does not center on whether the documents can comprise

attorney-client communications or work product, but rather on whether Eisenmann has somehow waived what protection it was due. As discussed below, the Court finds that Eisenmann has waived what claims to privilege it might have had. Bearing this in mind, the Court assumes for the purpose of its analysis (without finding so) that the documents are capable of being covered by the attorney-client privilege.

Third, in addition to the attorney-client privilege and work product doctrine, Eisenmann argues that some of the documents it produced to W-M should be protected because they "constitute trade secrets and confidential proprietary information." (Def.'s Resp. at 5.) In support of this broad statement, Eisenmann cites to Federal Rule of Civil Procedure 26(c)(7), which allows the court to issue a protective order to govern how trade secret and other confidential information are to be revealed. *See* Fed. R. Civ. P. 26(c)(7).

While Rule 26(c)(7) does allow the Court to issue a protective order, Eisenmann's argument misses the point. The Court may appropriately issue a protective order to protect against harmful use of proprietary information produced in discovery, but the fact that a discoverable piece of information is or may be a trade secret is not an excuse a party can employ after the fact in an attempt to retract material already produced in discovery. If Eisenmann wants to protect its trade secret information from use by parties with adverse economic interests, Eisenmann can seek a protective order from the Court, and it would have the burden of showing that a protective order is warranted. *See* Fed. R. Civ. P. 27(c); *Am. Tel. & Tel. v. Grady*, 594 F.2d 594 (7th Cir. 1978). Eisenmann spent a significant portion of its brief explaining why much of the information in binders 19 to 22 constitutes trade secrets. The Court need not decide whether the information may indeed be trade secrets under applicable law. In the event that

Eisenmann does move for the entry of a protective order, the Court will entertain arguments as to whether and to what extent these documents should be covered. Because Eisenmann has not sought a protective order from the Court, its argument that the documents are somehow privileged as being trade secrets is without merit.

## 2. Whether the Disclosure Was Inadvertent

Having assumed that the documents in the four binders are covered by the attorney-client privilege, work product doctrine, or both, the Court proceeds to the second step of the *Harmony Gold* framework, namely, whether disclosure of the privileged documents was inadvertent. *See* 169 F.R.D. at 116. Here, although Eisenmann allowed W-M to inspect and copy documents from binders 19 to 22, Eisenmann argues that its disclosure of these documents was inadvertent. (Def.'s Resp. at 8-14.) Under *Harmony Gold*, "The party claiming inadvertent disclosure has the burden of proving that the disclosure was truly inadvertent." 169 F.R.D. at 116 (citing *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.*, 132 F.R.D. 204, 207 (N.D. Ind. 1990)). The Court must consider all the circumstances surrounding the disclosure, rather than relying on a bright line rule. *Id.* This "totality of the circumstances"-type approach was also used in *Sanner*. 181 F.R.D. 374. In both *Harmony Gold* and *Sanner*, the courts considered such factors as the total amount of documents under review, the procedure the producing party employed in preparing the documents for inspection, and the action taken by the producing party upon learning of the inadvertent disclosure.[2]

---

[2] From the Court's observation, these considerations often overlap with the considerations as to whether the inadvertent disclosure waives any privilege, the third step in under *Harmony Gold*.

The facts of *Harmony Gold* are similar to this case. In *Harmony Gold*, the defendant served the plaintiff with a document request, and the plaintiff allowed the defendant to inspect various documents at the plaintiff's California office. *Harmony Gold*, 169 F.R.D. at 114. Included in the disclosed documents were three documents that the plaintiff asserted were covered by privilege. *Id.* at 114-15. Three weeks later, the defendant used the three documents as exhibits in support of a motion in the case. The plaintiff claimed that it first learned of the inadvertent disclosure when it saw that the three documents were used in the filing. *Id* at 115. Two weeks following the defendant's use of the documents as exhibits, the plaintiff contacted the defendant and attempted to retrieve the documents. *Id.* Although the court did not give weight to the plaintiff's self-serving statements that the disclosure was inadvertent, the court held with little analysis that the disclosure was inadvertent in light of the volume of the production (some 25,000 pages) and the fact that the documents disclosed were noted on the plaintiff's privilege log. *Id.* at 116.

In this case, both W-M's brief and Eisenmann's brief point to the number of documents produced in this case and the number of accidentally disclosed documents, and both briefs argue based on this that Eisenmann did or did not inadvertently disclose the disputed documents. (Pl.'s Mem. at 2-4; Def.'s Resp. at 9.) Eisenmann produced approximately 12,000 pages in total, of which Eisenmann claims approximately 120 are privileged and inadvertently disclosed. (*See* Def.'s Resp. at 9; Pl.'s Mem. at 3-4.) This is a large number of documents, but by itself, this number neither proves or disproves whether disclosure was inadvertent.

The Court next considers Eisenmann's procedure in preparing the documents for inspection in determining inadvertence. Eisenmann says the logistics of producing the

documents for W-M's inspection were in flux during the days leading up to May 30, 2006, the date W-M inspected Eisenmann's documents. According to Eisenmann, W-M changed its plans several times regarding the method of production, which "made it difficult and time consuming for Eisenmann and its counsel to coordinate the review and production." (Def.'s Resp. at 10.) In the meantime, Eisenmann had been keeping the documents in a conference room, which required Eisenmann to move the documents to and from a second conference room in order to accommodate unrelated use of the first conference room. All of this made the documents "susceptible to accidental rearrangement," which is exactly what happened. (*Id.*) When W-M arrived to inspect the documents, all of Eisenmann's binders, including numbers 19 to 22, were made available for W-M's inspection. (Def.'s Resp. at 10-11.)

This "preparation procedure" consideration does not support Eisenmann's assertions that its disclosure was inadvertent. Although W-M appears to question the reliability of Eisenmann's account, (Pl.'s Mem. at 3) ("Indeed, it is possible Eisenmann's counsel only reviewed the documents after the production took place." (emphasis in original)), the Court assumes that Eisenmann's rendition of the circumstances of its production of the documents is accurate. Nevertheless, the circumstances suggest that Eisenmann's disclosure was not inadvertent. First, Eisenmann did not provide a privilege log prior to the disclosure, as did the plaintiff in *Harmony Gold*. Although Eisenmann would have the Court believe that the Eisenmann's failure to provide the privilege log prior to disclosure does not indicate that the disclosure was inadvertent, (Def.'s Resp. at 12-13), the Court does not agree. While the absence of the privilege log is not in itself damning evidence that the disclosure was inadvertent, the presence of a privilege log prior to disclosure that contains all the privileged documents at issue would be significant evidence that

- 9 -

the disclosure was inadvertent. It would demonstrate clearly that Eisenmann intended to keep certain documents from being disclosed. Eisenmann is without this evidence, which invites the conclusion that Eisenmann never actually intended (prior to production) to keep binders 19 to 22 out of W-M's hands and that the disclosure was therefore not inadvertent.

Other circumstances surrounding the disclosure do not support Eisenmann's argument. Although Eisenmann supported its motion with affidavits, none of the affiants have firsthand knowledge of what happened when the documents were produced. In particular, Gunter Connert, an Eisenmann general manager, stated in his affidavit that the documents "were accidentally returned to the conference room by an Eisenmann employee." (Def.'s Mem. Ex. 2, ¶11.) This clever use of passive voice leaves the Court wondering exactly who accidentally returned the documents and how this occurred. Also, more generally, the Court questions the effectiveness of a screening system where within the passing of a mere six days following review by counsel the documents are moved among several storage locations and ultimately disclosed against counsel's directions. And, Eisenmann gives no answer as to why the documents, which were all in four binders, could not have been easily segregated away from all the other binders.

Finally, and perhaps most importantly, the Court considers Eisenmann's actions following its discovery that the documents were inadvertently produced. As discussed above, Eisenmann states that it discovered on July 10, 2006 that the documents in the four binders were disclosed. First, Eisenmann does not explain to the Court how it came to discover that the documents were disclosed. Second, although Eisenmann did act promptly in contacting W-M on July 10 seeking the return of the documents, Eisenmann did not request W-M's return of the entirety of the four binders. Instead, Eisenmann requested three documents, totaling 17 pages. This request

increased substantially in the weeks following July 10. Eisenmann has not explained how it came to discover the inadvertent production and why Eisenmann changed the amount of purportedly privileged material in its requests for W-M to return the material. In other words, because all of the disputed documents were kept in four binders, discovery of inadvertent production of one or more documents would necessarily require discovery of all the disputed documents. From this scenario, one must conclude that Eisenmann's intent to keep the documents out of W-M's hands was a mere afterthought.

Bearing all this in mind, the Court does not find that the privilege is inadvertent. For this reason alone, Eisenmann has voluntarily disclosed its privileged information and has waived what claims to privilege it had as to the various attorney-client and work product documents.

### 3. Whether the Privilege Was Waived

Even if the Court were to find that Eisenmann has shown that its production of the documents was inadvertent, Eisenmann has nonetheless waived any claim to privilege it may have had. Under the *Harmony Gold* framework, after determining that the disclosure was inadvertent, the Court must then determine whether Eisenmann has waived its privilege. The court in *Harmony Gold* succinctly identified the three approaches that courts have used in determining whether an inadvertent disclosure results in a waiver: "(1) a subjective approach; (2) an objective approach; and (3) a balancing test." *Harmony Gold*, 169 F.R.D. at 116 (citing *Golden Valley Microwave Foods, Inc.*, 132 F.R.D. at 208; *Int'l Digital Sys. Corp. v. Digital Equip. Corp.*, 120 F.R.D. 445, 448-49 (D. Mass. 1988)). According to *Harmony Gold*, the subjective approach never results in a waiver because, by definition, "inadvertent" production

- 11 -

does not involve a knowing intention to waive a privilege. *Id.* at 117. Under the objective approach, even if the disclosure was truly inadvertent, the breach of confidentiality has destroyed the basis for the privilege, so a waiver results despite any inadvertence. *Id.* Finally, the balancing approach analyzes each case of inadvertent disclosure by considering five factors: "(1) the reasonableness of the precautions taken to prevent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Id.* (citing *Golden Valley Microwave Foods, Inc.*, 132 F.R.D. at 208).

*Harmony Gold* purported to employ the objective approach, while also discussing the balancing approach. *See id.* In 1997, following *Harmony Gold*, the Seventh Circuit in *Dellwood Farms, Inc. v. Cargill, Inc.* stated, in an analogous case involving waiver of privilege, that "[t]he severity of punishment for a mistake should be proportioned to the gravity of the mistake." 128 F.3d 1122, 1127 (7th Cir. 1997). Courts following *Dellwood Farms* have cited this phrase and have consistently employed the balancing approach to waiver in inadvertent disclosure cases. *See, e.g., Int'l Oil v. Uno-Ven Co.*, No. 97 C 2663, 1998 WL 100264 (N.D. Ill. Feb. 23, 1998); *Sanner*, 181 F.R.D. 374. The balancing approach is the approach this Court adopts.

Under the balancing approach, the Court first considers the reasonableness of the precautions Eisenmann took to prevent disclosure. These precautions, which are discussed above and include storing the documents in the conference room and failing to provide a privilege log, were not reasonable and weigh in favor of finding that Eisenmann waived its privilege.

The Court next considers the time it took Eisenmann to rectify its error. Eisenmann states that it first discovered on July 10 that it had produced binders 19 to 22 along with the other

documents. (Def.'s Resp. at 15.) Eisenmann immediately contacted W-M and indicated that it had accidentally produced some documents that it believed were privileged. (*Id.*) At this initial communication, Eisenmann only requested the return of three documents, and it modified this amount over the coming weeks to raise the page number from 17 pages ultimately to 129 pages. (Pl.'s Supplemental Mot. ¶¶8, 9.) Although Eisenmann did initially act promptly upon learning of the mistake, Eisenmann does not indicate why it subsequently waited before requesting significantly more documents. Eisenmann offers no explanation as to why it requested the return of only three documents. If Eisenmann's counsel told Eisenmann to refrain from producing binders 19 to 22, the simplest and most effective action on July 10 would have been for Eisenmann to request the return of all the documents copied from binders 19 to 22. Although Eisenmann acted promptly upon learning of the mistaken production as to the three documents, it did not act promptly in requesting the return of all mistakenly produced documents. This factor weighs heavily in favor of a finding that Eisenmann's actions constitute a waiver.

The next factors–the scope of discovery and the extent of disclosure–do not weigh heavily in favor of either party. As discussed above in the context of inadvertence, both parties point to the number of documents produced on May 24 in relation to the number of documents that Eisenmann desired to withhold. On the one hand, Eisenmann's disclosure was substantial, and Eisenmann produced many documents. On the other hand, Eisenmann had already organized the privileged documents into four consecutive binders. Although Eisenmann produced some 30 binders of documents, Eisenmann did not need to comb through all of these documents on May 30 in order to keep track of the documents it did not want to disclose. (Indeed, it had done so beforehand.) Rather, Eisenmann could simply remove the four binders. Considering these

circumstances, the Court does not see that the scope of discovery and the extent of disclosure weigh heavily in favor of or against a waiver.

The final factor the Court considers in determining whether an inadvertent production constitutes a wavier is the overriding issue of fairness. The Court finds that this factor favors W-M. Eisenmann has not shown any actual prejudice beyond what is naturally felt by a party who loses a privilege. While Eisenmann may suffer the ill consequences of the waiver of its privilege, it has not shown that any unfairness would result from its waiver. The Court finds that the issue of fairness favors W-M.

Considering the balance of the foregoing analysis, even if the Court were to determine that Eisenmann's disclosure of the privileged documents was inadvertent, Eisenmann has nonetheless waived any claims to privilege it may have had. In sum, the Court finds that Eisenmann's disclosure of the materials was not inadvertent, and even if the disclosure was inadvertent, the disclosure nonetheless waives Eisenmann's claims to privilege.

## B.     Eisenmann's Failure to Timely Respond

In addition to the foregoing analysis, which focuses on the *Harmony Gold* framework, W-M argues that Eisenmann has waived its privilege independently of whether Eisenmann inadvertently produced the four binders. Initially, W-M argues that Eisenmann has waived any claim to privilege it might otherwise have had by failing to timely respond to W-M's document request. (Pl.'s Reply at 1.) As stated above, W-M served Eisenmann with a request for documents on April 5, 2006, and Eisenmann did not respond to that request until May 24, 2006. (Pl.'s Mot. ¶¶1, 2.) Federal Rule of Civil Procedure 34(b) states that "[t]he party upon whom the

- 14 -

request [for documents] is served shall serve a written response within 30 days after the service of the request." Fed. R. Civ. P. 34(b). Case law is clear that a party's failing to comply with the Rules—and specifically Rule 34(b)—may result in a waiver of any privilege claims. *See, e.g.*, *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 335 (N.D. Ill. 2001). Although Rule 34(b) does not have language stating that untimely objections are waived—language that is present in Rule 33(b)—courts have uniformly held that untimely objections to requests for documents may be waived. *See Autotech Techs. LP v. Automationdirect.com, Inc.*, 236 F.R.D. 396, 398 & n.2 (N.D. Ill. 2006). At the same time, a waiver is a harsh result, and courts have been hesitant to find a waiver of privilege where the violations are minor and where the parties have made good faith attempts to comply. *See, e.g., Ritacca*, 203 F.R.D. at 335.

Here, Eisenmann's response came 49 days after W-M's request, meaning that Eisenmann has not complied with the requirements of Rule 34(b). Although Eisenmann did not respond within 30 days, Eisenmann did respond only 19 days late by engaging in discussions with W-M regarding the logistics of discovery, rather than by dragging its feet. In other words, although Eisenmann was late, its delay was not lengthy and its eventual response was one of compliance. The small magnitude of Eisenmann's error is demonstrated by the fact that W-M did not raise this issue of delayed compliance until August 7 as part of its supplement to its motion. Given the harshness of a waiver and Eisenmann's eventual compliance, the Court finds that Eisenmann did not waive any claim to privilege for failure to timely respond to W-M's document request within 30 days.

## C. Eisenmann's Failure to Provide a Privilege Log

W-M further argues that Eisenmann has waived any claims to privilege it might have by failing to provide a privilege log. (Pl.'s Reply at 1-4.) Although Eisenmann's failure to provide a privilege log factors significantly into the inadvertent disclosure analysis above, W-M also argues that the lack of a privilege log constitutes a waiver independent of any inadvertent disclosure. (*See id.*) Federal Rule of Civil Procedure 26(b)(5) provides that a party withholding otherwise discoverable materials under a claim that the materials are privileged must provide a privilege log that will allow the other party to "assess the applicability of the privilege or protection." Fed. R. Civ. P. 26(b)(5). The log must list each separate document, and for each document the log must identify the date, author, recipients and recipients' capacities, subject matter, purpose for its production, and an explanation why the document is privileged. *Abbott Labs. v. Alpha Therapeutic Corp.*, 97 C 1292, 2000 WL 1863543, at \*3 (N.D. Ill. Dec. 14, 2000). The fact that the compilation of such a log is burdensome will not obviate the need for the log, particularly because "there are no presumptions operating in the discovery opponent's favor." *Id.* If a party fails to comply with the need to provide such a privilege log, that party fails to establish that the privilege applies. *Id.*

In this case, Eisenmann did not provide a privilege log when it responded to W-M's request for documents on May 24. Nor did it provide a privilege log when it discovered that it mistakenly produced binders 19 to 22. Eisenmann did not provide a privilege log until August 21, 2006, when it included a privilege log as part of its Response in the present issue. (*See* Def.'s Resp. Ex. 1.) Eisenmann's reason for its failure to provide a privilege log in this case is that a privilege log was unnecessary because most (approximately 90%) of the inadvertently produced

- 16 -

documents were trade secrets that Eisenmann claims are irrelevant to the case. (Def.'s Resp. at 12.) As for the inadvertently produced documents that were not trade secrets (the other approximately 10%), Eisenmann claims that providing a privilege log was not necessary because the documents on their face were clearly covered by attorney-client and work product privileges. (Def.'s Resp. at 12-13.) According to Eisenmann, "the disputed documents . . . are readily and clearly identifiable as either attorney-client communications or trade secrets, and requiring a privilege log for such would be overly burdensome." (Def.'s Resp. at 19.) Eisenmann also argues that the log was not necessary because W-M had "more than sufficient information to assess the applicability of the privilege without a privilege log because it is in possession of the disputed documents and all the information contained therein." (*Id.*)

Eisenmann's argument that a privilege log was not needed because the documents were clearly privileged is unavailing. This is counter to the spirit and letter of Rule 26(b)(5), which requires a privilege log so that the opposing party can ascertain whether any plausible argument exists why the documents should not be privileged. The central purpose of a privilege log is to allow the receiving party to assess the applicability of a claimed privilege *without* requiring the receiving party to look at the actual documents. Providing the documents themselves–even if they are privileged on their face–rather than a privilege log in order allow the opposing party to ascertain the applicability of any privilege is tantamount to purposeful disclosure.

Eisenmann also argues that case law does not suggest that a privilege log is necessary in situations of inadvertent production. (Def.'s Resp. at 20.) According to Eisenmann, "the privilege log requirement is limited to cases where a party is withholding documents." (*Id.*) In support of this argument, Eisenmann distinguishes *Abbott Labs*, which Eisenmann cites as being

- 17 -

"not a waiver case but a never-claimed-the-privilege-at-all case." (Def.'s Resp. at 20 n.10 (citing *Abbott Labs.*, 2000 WL 1863543, at \*4)). What Eisenmann misses is that the court in *Abbott Labs* was using hyperbole to demonstrate how tenuous Alpha's argument was that it inadvertently produced the documents in question in that case. In the "ideal" inadvertent production case, the producing party provides a privilege log and inadvertently produces documents that are listed on the log. Eisenmann's argument would suggest that a party need not provide a privilege log if it is planning on inadvertently producing the documents. This is nonsensical. In reality, if Eisenmann had planned on withholding the disputed documents, one would have expected Eisenmann to have provided some sort of privilege log. It did not. This Court holds that, by failing to provide a privilege log prior to disclosing the documents, Eisenmann has waived any claim it may have had to the documents at issue.[3]

### D.     Scope of the Waiver

Because the Court has found that Eisenmann has waived its claim to privilege as to the various documents at issue, the Court must next determine the scope of the waiver. Where a party has disclosed some privileged documents, waiving that privilege, the privilege is waived

---

[3] In addition to its arguments regarding inadvertent disclosure, late response to discovery requests, and failure to provide a privilege log, W-M also argues that Eisenmann has waived its claims to privilege because Eisenmann has disclosed the documents to third parties. First, W-M makes a broad argument, stating that because Eisenmann has not provided a name log with its privilege log, it is not possible to determine whether the recipients of the various documents fit within Eisenmann's control group. (Pl.'s Reply at 4.) In the wake of Eisenmann's belated privilege log, W-M's Reply gives specific arguments how two of the documents were disclosed to third parties, arguing that the recipients were not Eisenmann employees as of the documents' dates. (Pl.'s Reply at 5.) Because the Court holds that Eisenmann has waived its privilege due to its disclosure of the documents to W-M, the Court does not address whether the Eisenmann has waived its privilege due to disclosure to third parties.

"as to all documents of the same subject matter." *Chinnici v. Central DuPage Hosp. Ass'n*, 136 F.R.D. 464, 465 (N.D. Ill. 1991). A much quoted passage from *B & J Mfg. Co. v. FMC Corp.* states,

> A party cannot selectively divulge privileged information without impairing its attorney-client privilege as to the rest of that information concerning the same subject. The privilege exists in the first instance to encourage communications from a client to his attorney, and for that reason the confidence of such communications must be protected. . . . Once a party abandons this confidence by submitting privileged material in a discovery proceeding, the rationale of the privilege is dissipated, insofar as the subject matter of the privilege is concerned.

21 Fed. R. Serv. 2d 1119, 1119 (N.D. Ill. 1975).

Although a subject matter wavier is the general rule, courts have deviated from this rule where the results are particularly harsh and do not address the problems the subject matter waiver rule was designed to protect. For example, in *Graco Children's Products, Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd.*, the court rejected the defendant's argument that the documents the plaintiff sought had been inadvertently produced, finding instead that any claim to privilege had been waived. No. 95 C 1303, 1995 WL 360590, at \*7 (N.D. Ill. June 14, 1995). The court noted that the general rule calls for a waiver of the entire subject matter when a privileged document is voluntarily (i.e., not involuntarily) disclosed. *Id.* at \*8. The rationale for this rule is to prevent a party from disclosing favorable material while holding back damaging material. *Id.* According to the court,

> Selective disclosures to opposing parties results in subject matter waiver when selective disclosures were made for tactical purposes in the course of litigation. . . . There is no indication that [the disclosing persons] partially or selectively disclosed documents so as to gain a tactical advantage. Both parties simply produced complete files containing the privileged documents.

*Id.* at \*7, \*9 (citations omitted).

This reasoning applies in the present issue. Although the general rule would see this Court finding that Eisenmann has waived the entire subject matter of Eisenmann's various attorney-client and work product documents, this would yield a particularly harsh result. Eisenmann did not produce only part of its confidential material in an effort to gain a tactical advantage. Rather, its production simply included documents that were covered by privilege. In a sense, Eisenmann's waiver was a waiver by negligence, rather than wilfulness, and the Court believes that Eisenmann's conduct does not warrant a finding that Eisenmann has waived what would essentially be its entire world of privileged documents. This Court agrees with the court in *Graco Children's Products* that, at least in certain instances, "the *Wigmore* doctrine of strict waiver is atavistic and generates harsh results." *Id.* at \*9 (citing *Mendenhall v. Barber-Greene Co.*, 531 F. Supp. 951, 955 n.8 (N.D. Ill. 1982)). For this reason, the Court does not grant a complete subject matter waiver. Instead, Eisenmann has waived only the documents already disclosed to W-M, i.e., the documents in binders 19 to 22.

## III.  Conclusion

For the foregoing reasons, W-M's motion is granted. Eisenmann cannot claim that any of the documents produced in binders 19 to 22 are privileged. Eisenmann has waived its claim that some of the documents are covered by the attorney-client privilege or constitute work product. Eisenmann cannot retrieve any of the documents by claiming that they constitute trade secrets.

The scope of Eisenmann's wavier is limited to the documents already disclosed, which are contained in binders 19 to 22.

**ENTER ORDER:**

**MARTIN C. ASHMAN**

Dated: November 17, 2006.                    United States Magistrate Judge

Copies have been mailed to:

MITCHELL S. MUDANO, Esq.
Bradley Arant Rose & White, L.L.P.
One Federal Place
1819 Fifth Avenue North
Birmingham, AL  35203

STEVEN G.M. STEIN, Esq.
Stein, Ray & Harris, L.L.P.
222 West Adams Street
Suite 1800
Chicago, IL  60606

CHARLES A. DUNLOP, Esq.
Campion, Curran, Dunlop & Lamb, P.C.
8600 U.S. Highway 14
Suite 201
Crystal Lake, IL  60012

Attorneys for Plaintiff

TINA B. SOLIS, Esq.
Ungaretti & Harris, L.L.P.
3500 Three First National Plaza
Chicago, IL  60602

Attorney for Defendant