# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WUNDERLICH-MALEC SYSTEMS, INC., | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Case No. 05 C 4343 |
| v. | ) ) | Judge Robert W. Gettleman |
| EISENMANN CORPORATION, | ) ) ) | Magistrate Judge Martin C. Ashman |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion by Plaintiff, Wunderlich-Malec Systems, Inc. ("Wunderlich"), asking this Court to compel Defendant, Eisenmann Corporation ("Eisenmann"), to return documents that Wunderlich claims it inadvertently produced and which it claims are protected by the attorney-client privilege. Wunderlich also seeks sanctions against Eisenmann for failing to return the documents upon Wunderlich's request and for filing one of the documents as an attachment to its own motion, which is also before the Court. That motion by Eisenmann asks the Court to declare that, by producing the documents, Wunderlich waived any applicable privilege as to those documents. The Court decides these motions pursuant to Judge Gettleman's referral of the case for the purposes of discovery supervision in accordance with 28 U.S.C. § 636(b)(1)(A) and Local Rule 72.1. For the reasons that follow, Wunderlich's motion is denied. Eisenmann's motion, therefore, is granted.

## I. Background

The motions before the Court today in many ways form a mirror image of the motions that this Court ruled on in its Memorandum Opinion and Order of November 16, 2006, except that the proverbial shoe is on the other foot, with Wunderlich claiming an inadvertent disclosure of documents and Eisenmann arguing that a waiver of the attorney-client privilege has occurred. *See Wunderlich-Malec Sys., Inc. v. Eisenmann Corp.*, No. 05 C 4343, 2006 WL 3370700 (N.D. Ill. November 17, 2006). As the Court stated in its earlier opinion, the underlying dispute in this case and its tremendously complicated facts are largely irrelevant to the dispute before the Court today, which deals only with matters surrounding discovery. *Id.* at *1. Therefore, the Court sets forth only those facts that are relevant to the outcome of Wunderlich and Eisenmann's motions.

The crux of the dispute between Wunderlich and Eisenmann is a contract between the parties and a disagreement about the effect of certain modifications to the contract on the rights and obligations of the parties. On August 2, 2007, Wunderlich identified John Tompkins as its testifying expert, submitting a report by Tompkins and indicating that Tompkins would testify at trial regarding "scheduling, performance, and cost issues in this case." (Pl.'s Mot. at 1.) Eisenmann maintains, and a review of Tompkins's report confirms, that one of the subjects of the report was an opinion regarding which agreements and changes were applicable to certain work performed by Wunderlich. (*See, e.g.*, Tompkins Report at 14 ("[O]f the costing for the 22,939 hours expended in the period from November 1, 2004 to July 26, 2005, 19,322 hours were not covered by agreed changes . . . .").)

Tompkins based his report on numerous documents provided by Wunderlich; Wunderlich states that the total number of pages it produced to Tompkins was approximately 11,167.

(Tompkins Report at 4; Mudano Aff. ¶ 6.) In accordance with the Federal Rules of Civil Procedure, Wunderlich produced copies of the documents that were provided to Tompkins for Eisenmann's review on September 25, 2007. (Pl.'s Mot. at 1-2.) Without providing any concrete details of his efforts, one of Wunderlich's attorneys has sworn in an affidavit that he "diligently reviewed all of these documents for privilege and confidentiality before they were provided to BBRL [Tompkins's company] and again before the copies were produced to defendant Eisenmann." (Mudano Aff. ¶ 7.)

Despite both reviews, Wunderlich received a message from counsel for Eisenmann on October 5, 2007, stating that a document labeled BBRL000480, which appeared on Wunderlich's May 22, 2006, privilege log, was among the documents produced on September 25th. (Mudano Aff. ¶ 10.) Within hours of receiving this message, Wunderlich's attorney faxed a letter to Eisenmann's attorneys requesting that they destroy or return the document. (Mudano Aff., Ex. A.) Wunderlich's attorney proceeded to review the documents produced to Tompkins and Eisenmann and discovered on October 7th that a second document listed on Wunderlich's privilege log, labeled BBRL000531, had been produced to Tompkins and Eisenmann. (Mudano Aff. ¶ 12.) Wunderlich's attorney faxed a letter to Eisenmann's attorneys on October 7th requesting the return of document BBRL000531. (Mudano Aff., Ex. B.) Both documents are facsimile cover sheets sent to Wunderlich's attorneys by Denny Euers, Wunderlich's project manager from the Eisenmann project. (Pl.'s Mot. at 2.) The document that the Court has seen, BBRL000480, expresses Euer's concern "that when we accept the change order we also accepted their original PO [purchase order]." (Def.'s Mot., Ex. D.)

Wunderlich now moves the court to compel the return of the disputed documents. Wunderlich argues that the documents are privileged, that their production to Tompkins and Eisenmann was inadvertent, and that factors such as the number of documents produced, Wunderlich's prior identification of the documents on a privilege log, the precautions Wunderlich took in reviewing the documents, and Wunderlich's prompt action upon realizing its mistake all support a finding that the privilege has not been waived under the balancing test set forth in *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 115 (N.D. Ill. 1996). Eisenmann, conversely, argues that the privilege was waived when Wunderlich revealed the document to its testifying expert and by Wunderlich's voluntary disclosure of the document to Eisenmann.

## II. Discussion

As noted above, many of the issues implicated by the motions the Court decides here are identical to those the Court addressed in its Memorandum Opinion and Order of November 17, 2006. As it did in its earlier decision, the Court addresses Wunderlich's claim that it inadvertently produced privileged materials under the standard set forth in *Harmony Gold*. Under the *Harmony Gold* standard, the Court conducts a three-part inquiry when dealing with a claim that privileged materials have been inadvertently produced. *See Harmony Gold*, 169 F.R.D. at 115. First, the Court must determine whether the documents are in fact privileged. *Id.* Next, the Court must determine whether the disclosure of the documents was truly inadvertent. *Id.* Finally, the Court must determine whether the privilege has been waived. *Id.* In making the waiver determination, this Court holds, in keeping with its earlier decision, that a balancing approach is proper. *See Wunderlich*, 2006 WL 3370700 at *6; *Int'l Oil v. Uno-Ven Co.*,

- 4 -

No. 97 C 2663, 1998 WL 100264, at *3 (N.D. Ill. Feb. 23, 1998); *Sanner v. Bd. of Trade of the City of Chi.*, 181 F.R.D. 374, 379 (N.D. Ill. 1998). The Court's balancing approach takes into account: "(1) the reasonableness of the precautions taken to prevent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Wunderlich*, 2006 WL 3370700, at *6 (quoting *Harmony Gold*, 169 F.R.D. at 117).

### A. Are the Documents Privileged?

The Seventh Circuit has defined the attorney-client privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection may be waived.

*U.S. v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (citation omitted). The privilege extends to communications that "tend directly or indirectly to reveal the substance of a client confidence." *U.S. v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990.)

In this case, the disputed documents are facsimile cover sheets sent by Denny Euers, a representative of Wunderlich, to Wunderlich's attorneys in furtherance of an ongoing relationship of legal advice and consultation. (Pl.'s Mot. at 2.) Furthermore, the document that the Court has seen (BBRL000480) contains a communication from Euers to the attorneys for Wunderlich that expresses concern about a legal issue—the possible legal ramifications of accepting a "change order." (Def.'s Mot., Ex. D.) It is difficult to ascertain the status of the second document without having reviewed it. However, Eisenmann does not seriously contend that the documents are not

privileged. Ultimately, the existence of the privilege is immaterial to the outcome of the Court's decision, because the Court finds that any privilege that may have existed was waived. Therefore, the Court assumes without deciding that both documents at issue are covered by the attorney-client privilege.

### B. Was the Disclosure Inadvertent?

Wunderlich, as the party claiming an inadvertent disclosure, has the burden of proving that the disclosure truly was inadvertent. *Harmony Gold*, 169 F.R.D. at 116. In determining whether the disclosure was inadvertent, the Court looks to the totality of the circumstances surrounding the production of the privileged documents. *Sanner*, 181 F.R.D. at 378. In making this inquiry, this Court has relied on *Sanner* and *Harmony Gold* in looking to factors such as the total number of documents reviewed, the procedures used to review the documents before they were produced, and the actions of producing party after discovering that the documents had been produced. *See Wunderlich*, 2006 WL 3370700, at *3.

In this case, the total number of documents in the production at issue is uncertain, but the documents totaled approximately 11,167 pages. (Mudano Aff. ¶ 6.) This is a relatively large number, especially in relation to the relatively small number of disputed documents—2 pages. By contrast, when the Court last addressed this issue, Eisenmann had produced a similar number of pages (approximately 12,000) but claimed to have inadvertently disclosed approximately 120 pages. *Wunderlich*, 2006 WL 3370700, at *4. Clearly, the greater the ratio is between privileged documents and total documents produced, the more persuasive claims of inadvertent production

become. In this case, the size of the overall production and the number of pages of privileged documents support a finding of inadvertence.

Wunderlich's actions after producing the privileged documents also support a finding that the disclosure was inadvertent. Wunderlich produced the documents to Eisenmann on September 25th. (Pl.'s Mot. at 1-2.) When informed by counsel for Eisenmann on October 5th that a document that appeared on Wunderlich's privilege log had been produced, Wunderlich's attorney requested that it be returned and initiated a review that revealed the other privileged document within three days. (Mudano Aff. ¶ 12.) Again, a contrast with the previous instance of allegedly inadvertent production in this case is instructive. In its earlier decision, the Court based its finding that disclosure was not inadvertent on the fact that Eisenmann waited weeks before it requested that all of the disputed documents be returned, suggesting that "Eisenmann's intent to keep the documents out of [Wunderlich's] hands was a mere afterthought." *Wunderlich*, 2006 WL 3370700, at *5. In this case, Wunderlich's response was much more prompt, evincing a genuine desire to correct its mistake and lending credence to its claim of inadvertence.

The final factor—the procedures used to review the documents produced—is more ambiguous. Wunderlich, which carries the burden of proof as to this issue, provides little insight into the procedure it used to review the documents as it was preparing them for production beyond a conclusory statement that its attorney "diligently reviewed all of these documents for privilege and confidentiality." (Mudano Aff. ¶ 7.) As the *Harmony Gold* court noted, "self-serving declarations" are insufficient to satisfy the burden on the party seeking to establish that a disclosure was inadvertent. 169 F.R.D. at 116. Furthermore, the Court observes that the unspecified review procedure could not have been particularly effective, since it failed not once

but twice to reveal the disputed documents. Nonetheless, the documents do appear on Wunderlich's privilege log, a factor which this Court and others have given considerable weight. *See, e.g., Wunderlich*, 2006 WL 3370700, at *4; *Harmony Gold*, 169 F.R.D. at 116. *See also Sanner*, 181 F.R.D. at 378-79 (attorney's flagging of privileged documents to be removed by staff before production was a factor supporting finding of inadvertence).

The Court finds that the evidence, taking into account the totality of the circumstances surrounding the production of the privileged documents, supports a finding of inadvertence. While the precise procedure used to review the documents is not specified, and the repeated failure to detect the documents calls the procedure's efficacy into question, the existence of a privilege log, the relatively small number of disputed documents in comparison to the size of the production, and Wunderlich's actions after discovering that the documents had been produced convince the Court that the disclosure of the documents was in fact inadvertent.

### C. Was the Privilege Waived?

As discussed above, the Court decides the issue of waiver on a case-by-case basis, taking into account: "(1) the reasonableness of the precautions taken to prevent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Wunderlich*, 2006 WL 3370700, at *6 (quoting *Harmony Gold*, 169 F.R.D. at 117). For the reasons that follow, the Court finds that any privilege that existed with respect to the disputed documents was waived when Wunderlich produced the documents to Tompkins and then to Eisenmann.

The Court first considers the reasonableness of the precautions Wunderlich took to prevent disclosure. While this is in some ways similar to the third step of the inadvertence inquiry, it is different in that here the emphasis is not on whether the production was truly accidental, but rather on whether the procedures used were "reasonable." In other words, the Court focused earlier on the subjective intent of the lawyers as manifested in their review procedures, while now it focuses on the objective reasonableness of the procedures.

Weighing in Wunderlich's favor is the fact that it did produce a privilege log prior to this incident that identified the documents as privileged. However, two aspects of Wunderlich's procedure convince the Court that Wunderlich's precautions were unreasonable. First, Wunderlich has not given the Court any factual basis on which to evaluate its precautions, only a self-serving declaration that it made a "diligent review." Second, one crucial fact speaks for itself: the disputed documents were inadvertently produced two separate times. The Court finds, in light of the high duty all jurisdictions impose on lawyers to maintain the confidences of their clients, that any procedure which fails in two consecutive reviews to reveal documents that have already been identified as privileged is unreasonable. *See also Harmony Gold*, 169 F.R.D. at 117 (holding that a procedure that fails to detect documents already listed on a privilege log is "patently inadequate."). Therefore, the procedure used by Wunderlich's attorney to review the documents prior to production was unreasonable, supporting a finding that the privilege was waived as to the inadvertently produced documents.

The next three factors—the time it took for Wunderlich to react to its error, the scope of discovery, and the extent of the inadvertent disclosure—have already been discussed in determining whether the disclosure was inadvertent. However, as the Court noted in discussing

Wunderlich's review procedures, the same facts may have different significance when considered in the context of the waiver inquiry. In this case, the size of the overall production of documents (approximately 11,167 pages) was large, while the number of pages of inadvertently produced documents was small (2). Wunderlich's reaction time to the error, a total of two or three days, was relatively short in comparison to Eisenmann's two-week response time to its own inadvertent disclosure or the two-week response time in *Harmony Gold*. *See Wunderlich*, 2006 WL 3370700, at *1; *Harmony Gold*, 169 F.R.D. at 117. At the same time, it is significant that, in contrast to other cases reviewed by the Court, Wunderlich only learned of its error in this case after being informed by its adversary. (Mudano Aff. ¶ 10.) Taken together, these factors do not work strongly for or against a finding of waiver.

Courts in the Northern District of Illinois have identified the final factor—fairness—as "the overriding issue" in determining whether an inadvertent disclosure of privileged documents should operate as a waiver of the privilege. *See Wunderlich*, 2006 WL 3370700, at *7; *Sanner*, 181 F.R.D. at 379; *Harmony Gold*, 169 F.R.D. at 117. The Court finds that this factor tips the balance decisively in favor of a finding that the privilege has been waived.

The Seventh Circuit has embraced a norm of proportionality in cases involving waivers of privilege. *See, e.g., Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1227 (7th Cir. 1997) ("The severity of punishment for a mistake should be proportioned to the gravity of the mistake.") For its part, Wunderlich has not shown that any disproportionately harsh or unfair consequences would result from a waiver of the privilege with respect to the disputed documents. By contrast, the Court finds that Eisenmann would be seriously prejudiced if Wunderlich were allowed to assert the privilege and recall the documents it inadvertently produced. Crucial to this

finding is the fact that these documents have been produced not only to Eisenmann, but also to Tompkins, Wunderlich's expert. At least one of the documents refers to an issue—which agreement was applicable to certain work performed by Wunderlich—that Tompkins addresses in his report. Allowing Wunderlich to assert the privilege now would prejudice Eisenmann's ability to effectively cross-examine Tompkins as to the bases for his opinions. Wunderlich has presented a sworn declaration from Tompkins that he did not notice and did not rely on the disputed documents. (Tompkins Aff. ¶¶ 5, 6.) However, this in itself could be a basis for cross-examination regarding the thoroughness of Tompkins's review of the materials on which he based his opinion. Therefore, with respect to Eisenmann's need to be able to use the documents for effective cross-examination, it is immaterial whether Tompkins reviewed the documents or not.

Applying the *Harmony Gold* standard to the facts of this case, the Court assumes that the disputed documents were privileged, and agrees with Wunderlich that the disclosures, first to the expert Tompkins and then to Eisenmann, were inadvertent. Moving to the third prong of the *Harmony Gold* standard, the Court finds that Wunderlich's review procedure, which failed twice to reveal the presence of documents which had already been placed on a privilege log, was unreasonable. Furthermore, overriding concerns of fairness dictate that Wunderlich should not be allowed to "unring the bell" and deprive Eisenmann of documents that could be important if Eisenmann is to cross-examine Wunderlich's expert. For these reasons, the Court finds that Wunderlich has waived any privilege that may have covered the disputed documents.

### D. Scope of the Waiver

The general rule in cases of waiver is that when a party discloses privileged documents, the attorney-client privilege is waived "as to all documents of the same subject matter." *Chinnici v. Central DuPage Hosp. Ass'n*, 136 F.R.D. 464, 465 (N.D. Ill. 1991). This rule exists so that a party cannot "selectively divulge" privileged information for strategic purposes while withholding other privileged information on the same topic. *Id.* However, because the rationale for the subject matter waiver rule is to prevent strategic disclosure—which is necessarily intentional—courts have deviated from the general rule in cases that do not raise the same concerns about abuse of the privilege for tactical advantage. *See, e.g., Graco Children's Products, Inc. v. Dressler, Goldsmith, Shore & Milnamow, Ltd.*, No. 95 C 1303, 1995 WL 360590, at *9 (N.D. Ill. June 14, 1995) (where there was no evidence of intentional manipulation or selective disclosure of privileged materials, waiver applied only to the documents produced).

In this case, as discussed above, the Court finds that the disclosure of the disputed documents was inadvertent, the result of oversight rather than strategy. In such a case, this Court believes that a broad subject matter waiver would be unduly harsh and not in keeping with the Seventh Circuit's emphasis on the need for proportionality between the severity of a party's mistake and the severity of the punishment it receives. Therefore, the privilege has been waived as to documents BBRL000480 and BBRL000531 only, rather than to all communications relating to the same subject matter.

### III. Conclusion

For the reasons set forth above, the Court denies Wunderlich's motion to compel the return of the disputed documents, and grants Eisenmann's motion to deem the attorney client privilege waived with respect to the inadvertently produced documents only. Because the Court finds in favor of Eisenmann, Wunderlich's motion for sanctions is denied.

**ENTER ORDER:**

MARTIN C. ASHMAN
United States Magistrate Judge

Dated: October 18, 2007.

Copies have been mailed to:

| | |
|---|---|
| MITCHELL S. MUDANO, Esq.<br>Bradley, Arant, Rose & White, L.L.P.<br>One Federal Place<br>1819 Fifth Avenue North<br>Birmingham, AL 35203 | CHARLES A. DUNLOP, Esq.<br>Campion, Curran, Dunlop & Lamb, P.C.<br>8600 U.S. Highway 14<br>Suite 201<br>Crystal Lake, IL 60012-2759 |
| CARRIE L. BERGER, Esq.<br>Stein, Ray & Harris, L.L.P.<br>222 West Adams Street<br>Suite 1800<br>Chicago, IL 60606 | TINA B. SOLIS, Esq.<br>Ungaretti & Harris, L.L.P.<br>3500 Three First National Plaza<br>Chicago, IL 60602-4224 |
| Attorneys for Plaintiff/Counter-Defendant | Attorneys for Defendant/Counter-Plaintiff |